# Exhibit C

**SOAH Docket No. 701-23-03745.IDEA**
**TEA Docket No. 051-SE-1022**

# Before the
# State Office of Administrative Hearings

────

### STUDENT by next friends PARENT and PARENT, Petitioner
### v.
### Comal Independent School District, Respondent

### DECISION OF THE HEARING OFFICER

    \*\*\* (Student), by next friends \*\*\* and \*\*\* (Parents or, collectively, Petitioner), brings this action against the Comal Independent School District (Respondent or the District) under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§1400-1482, and its implementing state and federal regulations. The main issue in this case is whether the District provided Student with a free, appropriate public education (FAPE).

    The Hearing Officer concludes the District provided Student with a FAPE and a program reasonably calculated enable Student to make progress appropriate in light of Student's circumstances.

## I.   DUE PROCESS HEARING

The due process hearing was conducted on August 29-31, 2023, via the Zoom videoconferencing platform. Student was represented throughout this litigation by Student's legal counsel, Michael O'Dell of the Law Office of Michael O'Dell. *** and *** (***), Student's parents, attended the hearing. The District was represented throughout this litigation by its legal counsel, Andrew Tatgenhorst and Amber King of Thompson & Horton LLP. In addition, ***, the District's Executive Director of Special Programs and Services, attended the hearing as the party representative.

The parties offered joint and separately disclosed exhibits. Petitioner offered testimony of ***, the District Speech Language Pathologist (SLP) who worked with Student from summer 2021 to summer 2022; Dr. ***, Student's pediatrician; ***, Student's private Board Certified Behavior Analyst (BCBA); ***, a District registered nurse; ***, the assistant principal at Student's *** school; and Parent. Respondent offered testimony of ***, Student's 2022-2023 school year SLP; ***, Student's 2022-2023 homebound special education teacher; ***, the District BCBA; ***, the campus nurse for Student's *** school; ***, the District's Director of Special Education for ***; and ***, the District's Executive Director of Special Programs and Services. The hearing was recorded and transcribed by a certified court reporter. Both parties timely filed written closing briefs. The Decision in this case is due October 26, 2023.

## II.    ISSUES

### A.    Petitioner's Issues

Petitioner confirmed the following issues from 2022-2023 school year for hearing in this matter:

<u>FAPE</u>:

1.    Whether the District failed to provide Student with a FAPE for the relevant time period.

2.    Whether the District failed to develop an appropriate individualized education program (IEP) for Student.

3.    Whether the School District failed to properly implement Student's IEP.

<u>Training</u>:

1.    Whether the District failed to properly train the homebound teacher and related personnel to implement Student's IEP.

### B. RESPONDENT'S LEGAL POSITION AND ADDITIONAL ISSUE

The District generally and specifically denied Petitioner's issues and denied responsibility for providing any of Petitioner's requested relief. The District filed a counterclaim to override lack of parental consent for medical and educational evaluations.

## III.   REQUESTED RELIEF

### A.   Petitioner's Requested Relief

Petitioner confirmed the following items of requested relief:

1. The District to reinstate and provide Student with continuous homebound services provided in Student's home for the remainder of the 2022-2023 school year and during extended school year (ESY) services in summer 2023 as agreed upon in Student's current IEP dated August ***, 2022.

2. The District to provide Student with the following outside private compensatory services with parent-selected providers/vendors:

   a. Physical Therapy – 72 one-hour sessions;
   b. Occupational Therapy (OT) – 108 one-hour sessions;
   c. Speech Therapy – 180  one-hour sessions;
   d. Applied behavior analysis (ABA) Therapy – 216 one-hour sessions; and
   e. Special Education Instructional Teacher – 360 one-hour sessions.

3. The District to provide private educational services for Student's *** grade instructional school years to include special education instruction in speech therapy, OT, physical therapy, and ABA therapy commensurate with the District's instructional school day for the school years and extended summer school years. The private educational services to include formal evaluations, assessments, and provider instructional preparation time.

4. The District to provide a $5,000 stipend to parents for autism-related instructional, sensory, and behavioral resources and materials for Student.

5. The District to provide a $2,000 stipend to parents for autism, sensory, and behavior training for parents.

**B.      Respondent's Requested Relief**

An order overriding lack of parental consent for medical and educational evaluations.

## IV.    FINDINGS OF FACT

1.   Student enrolled in the District in the 2019–2020 school year in the ***. Student is eligible for special education services as a student with disabilities in the areas of autism and speech impairment. Student's initial full individual evaluation (FIE) was conducted in December 2019 and an updated evaluation was due in December 2022. Student attended school in-person during the 2019–2020 school year and virtually from March 2020 through the 2020–2021 school year. During the 2021–2022 school year, Student received services via virtual homebound instruction due to health concerns.[1]

2.   Student lives at home with Student's parents ***. ***Parent.[2]

3.   The District conducted an FIE on February ***, 2019. Student's IEPs indicated the FIE was completed in December 2019, no one provided an explanation for the discrepancy. Student met eligibility requirements as a student with a speech impairment in the areas of receptive and expressive language and pragmatics. Student also met the criteria for other heath impairment (OHI) due to ***.[3]

---

[1] Joint Stipulations of act; Joint Exhibits (JE) 2 p. 5; JE 3 p. 8; JE 24 p. 23; Transcript (TR) Vol. I pp. 140-144; TR Vol. II p. 280-81, 441.

[2] JE 2 p. 16; TR Vol. II pp. 278-79.

[3] JE 5 pp. 4, 6, 15.

4.      The District conducted a Review of Existing Evaluation Data (REED) on September \*\*\*, 2019, for a suspected disability of autism. Parents informed the District Student was \*\*\*. The REED determined Student needed an autism assessment and behavior specialist observation.[4]

5.      Student's admission, review, and dismissal (ARD) Committee met on April \*\*\*, 2022, and Parents attended with their attorney. Student's education setting was virtual homebound for the remainder of the 2021-22 school year and scheduled for in-person for the 2022–2023 school year. The meeting ended in disagreement after reconvening on May \*\*\*, 2022, and May \*\*\*, 2022.[5]

6.      The April \*\*\*, 2022 ARD Committee discussed Student's \*\*\*. Student is \*\*\*. Parent expressed concerns about Student having access to \*\*\* and, without access to it, Student was unable to attend school on campus. The school nurse informed Parents that the District's physician's standing orders changed post-Covid, and \*\*\*is no longer allowed in the campus clinic. Parents are allowed to \*\*\*.[6]

7.      Parents filed a due process complaint on April 28, 2022, and settled with the District on July 21, 2022. Student received compensatory services with an individual, certified special education teacher, a private occupational therapist, a private SLP, and a private BCBA. Parent did not allow the private providers to share data or progress notes with the District.[7]

**First Semester: 2022–2023 School Year**

---

[4] JE 23 pp. 1-2, 6, 15.

[5] JE 2 pp. 35, 37, 42, 44, 45; JE 3 p. 33; TR Vol. III p. 649.

[6] JE 3 p. 13; TR Vol. I pp. 146-47, TR Vol. III pp. 607, 623.

[7] Respondent's Exhibit (RE) 1; TR Vol. III p. 728-29.

8.     On August ***, 2022, the District received Student's homebound needs evaluation signed by Student's physician. The document indicated Student ***, but it failed to indicate how ***. The section for the physician to describe the nature of the condition requiring homebound services only stated, "patient suffers from" and was incomplete. The form further indicated that Student is not able to receive instruction services on a regular campus and that no accommodations would allow Student to do so, but had no written explanation. The form indicated Student was ***.[8]

9.     Student was a *** grader in the District for the 2022–2023 school year. The District held an annual ARD Committee meeting on August ***, 2022, with Parents in attendance. The Committee discussed Student's present levels of academic achievement and functional performance (PLAAFPs) and goals and made revisions with Parents' input. During the ARD Committee meeting, the District informed Parents it needed additional information regarding Student's *** in order to recommend homebound services due to the incomplete homebound needs evaluation provided on August ***, 2022. The ARD Committee meeting ended in disagreement and reconvened on September ***, 2022.[9]

10.    The District received an updated homebound needs evaluation signed by Student's physician on August ***, 2022. The form indicated the ***. The section describing the nature of the condition was completed and stated "***. The level of care required and optimal Covid risk mitigation would require homebound services." The period of confinement was June ***, 2022 to June 2023. The updated form included Student's same ***.[10]

---

[8] JE 2 pp. 79-80; JE 15 pp. 6-7, 11-13, 15.

[9] Joint Stipulations of Fact; JE 2 pp. 43-44.

[10] JE 2 p. 89; JE 15 pp. 15-17; TR Vol. III pp. 607-08.

11.  At Parents' request, a Texas Education Agency IEP facilitator facilitated the reconvene ARD Committee meeting on September ***, 2022. The Committee developed Student's IEP based on Student's 2019 FIE, parent input, and teacher input. Student's IEP included PLAAFPs in the areas of reading, speech, written expression, math, behavior, ***. It included assistive technology in the form of an ***. Additionally, Student received the following assistive technology devices and/or services: ***.[11]

12.  Student's September ***, 2022 IEP included annual goals and objectives in reading, ***, math, ***, and speech therapy. It included the following accommodations: directions given in a variety of ways/simplified vocabulary; encouragement for classroom participation; extra time for oral responses; frequent teacher check for understanding; gain Student's attention before giving directions; immediate feedback; minimize distractions when introducing a new skill; short instruction; sit near teacher for instructional purposes; visual aids; adapted classroom tools; ***; extra time for completing assignments; flexible seating; frequent eye contact/proximity control; positive reinforcement; scheduled movement breaks; sensory tools/diet and strategies; teacher initiated movement/sensory breaks; visual cues for work space, walking space, and belongings; ***.[12]

13.  The ARD Committee reviewed the autism supplement and a parent in-home training needs assessment. Student had difficulty with changes in routine and changes to academic material. Student required teacher/adult prompting to initiate and attend an activity and during transitions. Parent indicated Student ***. Student ***; Student is constantly in

---

[11] JE 2 pp. 16, 44; Petitioner's Exhibit (PE) 14; TR Vol. II p. 294.

[12] JE 2 pp. 31-32.

***.[13]

14.    Student's IEP placed Student in the homebound setting. Student received instructional services 7.5 hours per week. Student received speech therapy directly for 30 minutes three times per week and direct and indirect OT for 20 minutes one time per week for two weeks during a *** grading period. After discussions and adjustment to goals with Parents' input, the meeting ended in agreement. The ARD Committee agreed to ESY services for summer 2023 but agreed to discuss specifics at a later date. The District requested updated evaluations in all areas, but Parents did not provide consent. Parents felt Student needed time to transition with the new District staff before an evaluation would be appropriate.[14]

15.    The District sent Parents Notice and Consent for an FIE in the areas of communicative status, health, motor abilities, emotional/behavioral status, sociological status, intellectual/adaptive behavior, academic performance, and assistive technology on September ***, 2022.[15]

16.    Parents emailed the District on September ***, 2022, and stated they would not provide copies of Student's outside evaluations from the summer. According to Parents, the District had shown a pattern of "non-responsiveness" and had not shown "good faith in supporting Student's educational needs." Parents indicated that there was no need to reconvene the REED from September ***, 2022, and that Student's current IEP was appropriate. Through subsequent emails, the District notified Parents the ARD Committee meeting was not a REED and again asked for consent for an evaluation. Parents again declined. The District then requested an ARD Committee meeting to discuss a REED, Student's progress on Student's IEP goals, and any adjustments needed to Student's IEP since Student had been receiving in-person instruction for the first time since March 2020.[16]

---

[13] JE 2 pp. 63-69.

[14] JE 2 pp. 38-39, 44-46; TR Vol. II pp. 298-99.

[15] JE 25.

[16] RE 12 pp. 1, 3-4; TR Vol. III p. 657.

17.    Student started receiving homebound services for the 2022–2023 school year on September ***, 2022. The room used for Student's services was a ***. The room included ***. The room had *** and Student's District providers noted Student ***.[17]

18.    Student received *** days of instruction from the homebound teacher and *** days of instruction from the SLP before in-home services were discontinued. District providers had difficulty getting Student to sit for longer than a minute or two. ParentParent recorded the sessions without the District providers' knowledge.[18]

19.    ***Parent during all the homebound teacher's sessions with Student. Student would regularly ***Parent. The homebound teacher found ParentParent's presence in the room a distraction for Student. She did ask for ParentParent's help on a few occasions and ParentParent assisted. Student began to form a bond with the homebound teacher ***.[19]

20.    During the speech therapy sessions, ParentParent was present and would interject and give Student commands. The SLP characterized this as a distraction and made the environment overstimulating for Student. The SLP was able to get Student to sit for 2 to 3 minutes. After her first session, Student no longer tried to ***. The SLP utilized a natural language environment, which means she used what interested Student for instruction. For example, if Student ***.[20]

21.    During their direct instruction, Student's SLP and homebound teacher implemented many of Student's accommodations such as encouragement, gaining Student's attention, and visual schedule. Student's homebound

---

[17] JE 9 p. 1; TR Vol. I p. 100, 129; TR Vol. II pp. 313, 488-89.

[18] TR Vol. I pp. 100, 196, 203-04; TR Vol. II pp. 486-87, 495, 508.

[19] Vol. II pp. 490-91, 493-95.

[20] TR Vol. I pp. 184-85, 198, 200, 228.

Decision and Order, SOAH Docket No. 701-23-03745,
Referring Agency No. 051-SE-1022

teacher realized Student lacked several prerequisite skills to meet Student's IEP goals as written. Parent commented to District staff about the abilities of the private BCBA and how she could get Student to sit for five minutes. The District providers requested to consult with Student's private BCBA and Parent denied the request.[21]

21.     Student's homebound teacher and SLP received multiple trainings specific to Student, including trainings on the *** in August 2022. District staff received trainings on health services, FAPE, the Family Educational Rights and Privacy Act (FERPA), PLAAFPs, and IEP documentation/data collection. The District's homebound teacher, SLP, assistive technology specialist, and instructional specialist met almost 20 times during the fall of 2022 to discuss Student. The homebound teacher also met with the District's BCBA four or five times to discuss strategies on how to obtain instructional control.[22]

22.     The District's direct service providers met with the District's Director of Special Education Services for *** weekly to discuss strategies and Student's progress. The homebound teacher and SLP brought up concerns about the space where instruction was provided. They planned to address this at the upcoming ARD Committee meeting in October.[23]

23.     On October ***, 2022, Parent agreed to the District's request for an ARD Committee meeting. The meeting was scheduled for October ***, 2022, but Parents requested to reschedule.[24]

24.     An incident occurred between the Parents and the homebound teacher on October ***, 2022. The District decided to suspend sending District employees into the home due to the incident with the homebound teacher and based on four prior homebound teachers' requests to not work in the family's home.[25]

---

[21] TR Vol. I pp. 176-79; TR Vol. II pp. 474-76, 479, 508-09.

[22] RE 10; RE 24; RE 25; TR Vol. I pp. 170-73; TR Vol. II pp. 471-72, 511; TR Vol. III pp. 562-63.

[23] TR Vol. III pp. 658-60.

[24] RE 12; RE 13 p. 2.

[25] JE 9 p. 2; TR Vol. I pp. 337-38; TR Vol. II pp. 495-500; TR Vol. III pp. 661-62.

25. The District notified Parents by email on October ***, 2022, that they would not be providing services in the home due to the incident that day. The District recommended moving the homebound services to a neutral location such as a public library, church, or activity center in the area in order to gain instructional control and to remove the distractions present in Student's room. Parents wanted homebound services in the home and declined to allow homebound services in a public location.[26]

24. Parent refused a neutral location due to Student's ***. The District reviewed the Americans with Disabilities Act (ADA) accommodations that public locations are required to follow for *** and were willing to address *** issues.[27]

25. After Parents requested to reschedule the October ***, 2022 meeting, the ARD Committee met on November ***, 2022. Parents were present with their attorney, advocate, and private BCBA. Parents expressed concerns regarding PLAAFPs, and the PLAAFPs were updated based on input from Parents, Student's private BCBA, and District personnel. The District again requested updated evaluations, and Parents did not consent. Parents signed consent for the District to speak to Student's private BCBA only if Parents were present during the exchange. The meeting was paused due to time constraints.[28]

26. The District presented Parents with a Notice and Consent for Evaluation on November ***, 2022. Parents refused to consent to a District evaluation because they felt Student had recent private evaluations, academic deficits, heightened anxiety, and increased sensory dysregulation due to the District not providing direct instruction during the first and second *** of the 2022-2023 school year. Parent believed no additional evaluation was needed at the time.[29]

---

[26] PE 43; TR Vol. III p. 747.

[27] TR. Vol. III pp. 663-64.

[28] JE 1 pp. 1, 5, 10, 43.

[29] JE 24 pp. 1, 3; JE 27; JE 28; JE 29.

**Private Evaluations Provided by Parents**

27.  On November ***, 2022, Parents provided multiple private evaluations to the District. The evaluations included a speech evaluation, an OT progress report, an autism evaluation, ABA report, and an assistive technology/*** evaluation.[30]

28.  Student's private speech therapy evaluation report from August ***, 2022, included history from Parents, clinical observation, and administration of the Developmental Assessment of Young Children-Second Edition (DAYC-2). Student presented with severe expressive and receptive language delay, as well as delayed pragmatic language skills. Student demonstrated difficulty consistently following directives, participated in tasks when highly motivated and did not participate in tasks when not interested in them. Student demonstrated improvement in navigating Student's *** and continued to require significant prompting to consistently use the ***. The evaluator recommended Student receive speech therapy intervention in person, two times per week for a year to address Student's deficits. The evaluator's recommended strategies and treatment goals were similar to those included in Student's IEP.[31]

29.  Student's private OT progress report, dated June ***, 2022, indicated Student needed maximum support or assistance while working on most goals. Student's main hinderance in progress was Student's inconsistent willingness to actively participate in treatment sessions.[32]

30.  Student's private autism evaluation was completed on July ***, 2022, by Student's pediatrician, who is board certified in developmental and behavioral pediatrics. The evaluation diagnosed Student with *** manifesting as autism spectrum disorder; *** manifesting as moderate to severe receptive, expressive, and pragmatic language disorder; and ***manifesting as delayed motor and sensory processing skills leading to anxiety and poor self-

---

[30] JE 24 p. 1.

[31] JE 24 pp. 12-17.

[32] JE 24 pp. 20-21.

regulation. Student is ***. Student is agitated easily and ***. Student's ***, and if Student's sensory needs are not met, it can lead to agitation.[33]

31. Student's pediatrician recommended Student work with an academic language therapist, consult with an occupational therapist, counseling, development of an IEP under the eligibility of OHI, with speech impairment as a secondary eligibility, and supports for attention control such as preferred seating, shortened tasks, visual supports, and a token economy, along with several books and website resources.[34]

32. Student's former private ABA treatment plan from ABA and Behavioral Services dated July 2022, relied on parent interview, therapist interview, verbal behavior milestones assessment and placement program (VB-MAPP) and reinforcer assessment. Student did not receive ABA therapy from November 2021 to July 2022. As of July 2022, Student's former private ABA therapist noted Student struggled with staying in one area, was inconsistent in responding to commands, and required full physical and verbal prompting to follow instructions. Student remained a candidate for intensive ABA therapy to help Student facilitate communication and language skills, social skills, functional living skills, and decrease maladaptive behaviors. The evaluation recommended progression in social skills such as Student being tolerant of others, playing with children Student's own age, and adapting to Student's environment.[35]

33. Student's current private BCBA from *** worked with Student from September 2022 to March 2023, then began services again in July 2023. She indicated Student would benefit from "more hands on deck" to establish a good routine for Student. She focused on tracking Student's *** from the work area, and general transitions from break time back to work tasks. During the private BCBA's instruction time, Parent would assist with *** and redirection of

---

[33] PE 2; TR Vol. I pp. 69, 72-73.

[34] PE 2 pp. 7-11.

[35] JE 24 pp. 34-57.

Student. The District attempted to collaborate with the private BCBA; however, it did not occur due to scheduling conflicts and because the private BCBA did not expect that collaboration with the District was part of her work with Student.[36]

34. The District attempted to hold the reconvene ARD Committee meeting on December ***, 2022, and January ***, 2023, and Parents requested to reschedule. The District offered February ***, 2023, as a date to resume the November ***, 2022 meeting, and Parents agreed.[37]

**Second Semester: 2022–2023 School Year**

35. On January ***, 2023, the District offered to implement services in the home in the following manner: two District special education teachers alongside a BCBA to assist with instructional control; a teacher-recommended workspace within the common areas of the home in an open environment; direct instruction in an open environment while Parents remained in a separate location; parent/teacher collaboration outside of instructional time and not in front of Student; and District-provided speech therapy sessions alongside a BCBA. Additionally, the District proposed community-based instruction of 1–2 sessions per month and in-home parent training in collaboration with the BCBA.[38]

36. On February ***, 2023, the District conducted a planning REED and reconvened Student's revision ARD Committee meeting from November ***, 2022. Parents attended with their attorney. The planning REED was held to address additional areas of evaluation requested by the District. The Committee discussed Student's private evaluations from summer 2022 during the meeting. Parents again refused to provide consent for any updated evaluations. Parents claimed evaluations would not be valid due to Student not receiving instruction since October ***, 2022 and because the private evaluations were provided to the District. The District again proposed homebound services as their letter dated January ***, 2023, indicated.[39]

---

[36] TR Vol. I pp. 73, 95, 99, 104, 127-28.

[37] RE 13 p. 1; JE 1 pp. 32-38.

[38] RE 14 pp. 1-2.

[39] JE 1 pp. 5, 6-7; JE 24 p. 1.

37.   Parents disagreed with the proposed location and methodology of services, specifically the parameters of Parents remaining in a separate location. The District again proposed the option of a community-based location outside of the home for instruction, and Parents disagreed due to Student's health and safety concerns. Parents refused the District's proposal to provide homebound services in an open environment in the home because Parent did not believe that type of space was "appropriate" for Student or that the District could "dictate" what the learning space was in the home.[40]

38.   The February ***, 2023 ARD Committee determined Student continued to meet the criteria as a student with a speech impairment in the areas of receptive and expressive language, continued to be eligible to receive OT services and assistive technology services, and continued to be eligible for services as a student with autism. Student no longer qualified under OHI because Student no longer had ***.[41]

39.   The District sent another Notice of Full and Individual Evaluation on February ***, 2023, and continued to request a medical evaluation to obtain clarification of Student's doctor's orders and what accommodations Student needed to attend on-campus instruction. The District requested evaluations for motor abilities, emotional/behavioral, intellectual/adaptive behavior, academic performance, and assistive technology. Parent did not provide consent for any evaluations. Student was privately evaluated for speech, ABA, and OT in the summer of 2023.[42]

40.   On February ***, 2023, the District sent Parents a letter with a revised offer for homebound services. The District offered direct instruction in a common area "free from parent-initiated interruption or contact during direct instruction." All other parameters from the prior offer remained the same.[43]

---

[40] JE 1 p. 7; TR Vol. II p. 418.

[41] JE 24 pp. 17, 23, 70.

[42] JE 1 p. 6; JE 29; TR Vol. II pp. 358-361; TR Vol. III pp. 675-76.

[43] RE 2, RE 14 p. 1.

41.   Parents received in-home parent training on October ***, 2022, and March ***,
      April ***, April ***, May ***, and May ***, 2023. The District used the ***
      program.[44]

42.   Student's report card from the 2022–2023 school year was marked with ***
      throughout except for one section about Student's ***. Student received ***
      for ***. Student received *** for ***. Student received *** for ***.[45]

43.   On May ***, 2023, the District offered Student ESY services for summer
      2023 in a proposed IEP amendment of the September ***, 2022 IEP. The
      amendment included homebound services for 1 hour per day four days a
      week, one 30-minute OT session for each summer session, and speech
      therapy for 30 minutes weekly. The services were to be provided in the same
      manner proposed by the District in February 2023.[46]

44.   Parents requested an ARD Committee meeting regarding ESY services.
      Parents disagreed with the IEP amendment and decided to provide ESY
      services privately. The District rejected Parents' request for an ARD
      Committee meeting and provided them with prior written notice, indicating
      that it would not convene the meeting because Parent disagreed with the IEP
      amendment; stay put was in effect due to the pending due process hearing;
      and the position that it was not required to conduct an ARD committee
      meeting during active litigation.[47]

45.   The District received a new homebound needs evaluation dated May ***,
      2023. The evaluation indicated Student's ***. Student had ***

---

[44] JE 13 pp. 1-2.

[45] JE 6 pp. 5-7.

[46] JE 17; JE18.

[47] JE 20 p. 1; PE 48; RE 21.

***. The physician indicated Student needed homebound services because of Student's multiple *** and, given Student's autism, Student was unable to avoid or advocate for ***. Student's previous *** continued.[48]

46.   The District made multiple settlement offers prior to this due process hearing. The last one from June ***, 2023, included compensatory services for school year services in the amounts of 270 instructional hours provided for 36 weeks at 7.5 hours per week, 36 hours of speech therapy, 36 hours of OT, 36 hours of ABA. Additionally, they offered compensatory services for ESY services in the amount of 24 instructional hours for six weeks at 4 hours per week, 1 hour of speech therapy and 1 hour of OT consults. They also offered to pay attorney fees. Parent did not accept the offer because it did not include the "correct" number of speech therapy sessions missed by Student and it did not account for "regression."[49]

47.   Student's *** campus is not currently ***. The ***; however, other students' parents provide ***, and the District's ***.[50]

## V.   DISCUSSION

### A.   Burden of Proof

The burden of proof in a due process hearing is on the party challenging the proposed IEP and placement. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005). There is no distinction between the burden of proof in an administrative hearing or in a judicial proceeding. *Richardson Indep. Sch. Dist. v. Michael Z.,* 580 F.

---

[48] JE 16.

[49] RE 4; RE 5; RE 6; TR Vol. II p. 380.

[50] PE 7; TR Vol. III pp. 625-27.

3d 286, 292 n.4 (5th Cir. 2009). The burden of proof in this case is on Petitioner to show the District failed to provide Student with a FAPE *and* to offer a program that is reasonably calculated to provide Student with the requisite educational benefit. *Schaffer,* 546 U.S. at 62; *Endrew F.,* 580 U.S. at 399.

**B.    Duty to Provide FAPE**

The purpose of the IDEA is to ensure that all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living. 20 U.S.C. § 1400(d). The district has a duty to provide a FAPE to all children with disabilities ages 3–21 in its jurisdiction. 34 C. F.R. §§ 300.101(a), 300.201; Tex. Educ. Code § 29.001.

The district is responsible for providing Student with specially designed personalized instruction with sufficient support services to meet Student's unique needs in order to receive an educational benefit. The instruction and services must be provided at public expense and comport with Student's IEP. 20 U.S.C. § 1401(9)*; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188-89, 200-01, 203-04 (1982). The basic inquiry is whether the IEP implemented by the school district "was reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1,* 580 U.S. 386, 399 (2017)*.*

## C.     FAPE

The Fifth Circuit has articulated a four-factor test to determine whether a Texas school district's program meets IDEA requirements. Those factors are:

1.     Whether the program is individualized on the basis of the student's assessment and performance;
2.     Whether the program is administered in the least restrictive environment;
3.     Whether the services are provided in a coordinated, collaborative manner by the key stakeholders; and
4.     Whether positive academic and non-academic benefits are demonstrated.

*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.,* 118 F. 3d 245, 253 (5th Cir. 1997).

Even after the Supreme Court's 2017 decision in *Endrew F.*, the test to determine whether a school district has provided a FAPE remains the four-factor test outlined by the Fifth Circuit. *E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 765 (5th Cir. 2018).

These four factors need not be accorded any particular weight nor be applied in any particular way. Instead, they are merely indicators of an appropriate program and intended to guide the fact-intensive inquiry required in evaluating the school district's educational program. *Richardson Indep. Sch. Dist..,* 580 F.3d at 294.

## 1.    Individualized on the Basis of Assessment and Performance

In meeting the obligation to provide a FAPE, the school district must have in effect an IEP at the beginning of each school year. An IEP is more than simply a written statement of annual goals and objectives and how they will be measured. Instead, the IEP must include a description of the related services, supplementary supports and services, the instructional arrangement, program modifications, supports for school personnel, designated staff to provide the services, the duration and frequency of the services, and the location where the services will be provided. 34 C.F.R. §§ 300.22, 300.323(a). While the IEP need not be the best possible one nor must it be designed to maximize Student's potential, the school district must nevertheless provide Student with a meaningful educational benefit—one that is likely to produce progress, not regression or trivial advancement. *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.,* 582 F.3d 576, 583 (5th Cir. 2009).

The District's obligation when developing Student's IEP is to consider Student's strengths, Student's parent's concerns for enhancing Student's education, results of the most recent evaluation data, and Student's academic, developmental, and functional needs. 34 C.F.R. § 300.324(a)(1)(i).

The evidence showed the District developed an IEP that was appropriately individualized for Student based on assessment and performance. Parents agreed with the IEP from September ***, 2022. Based on the documents produced at hearing, the ARD Committee did not change any of Student's goals or objectives in the November ***, 2022 or February ***, 2023 meetings, only Student's PLAAFPs

based on parent input. Student's IEP included several PLAAFPs, goals, and accommodations, which were developed based on Student's FIE from 2019, summer 2022 private evaluations, parent input, and input from Student's various private and District providers regarding Student's developmental and functional needs. Additionally, the IEP addressed the autism supplement and parent training. The only disagreement Parents had with the IEP was the location of homebound services.

The determination of homebound services is made by the ARD Committee. In this case, the ARD Committee did not have complete information in August 2022 to agree Student required homebound instruction based on Student's ***. Once the District received the updated homebound needs evaluation, the ARD Committee reconvened, and Student's placement was continued as homebound. Services were provided for *** days, and during that time, the District providers were assessing Student's current abilities and needs.

After the October ***, 2023 incident, the District requested homebound services be provided in a neutral location based on Student's needs. Student was overstimulated with all the items in the room and distracted by Parent's presence during instruction. After Parents disagreed with a neutral location, the District offered services in the home within certain parameters. These parameters were based on information from District providers and on Student's abilities and needs. Parents disagreed with the parameters, and Petitioner's closing brief argued Parents disagreed with services provided in an open area of the home due to safety; however, Parent testified it was not a safety issue, but about appropriateness. Parents continued to demand services be provided in the

room they selected.

Petitioner praised the current private BCBA's ability to get Student to sit for 5 minutes, while District employees could only manage a maximum of 2 minutes. However, ABA therapy provided by the private BCBA is different than providing direct instruction based on IEP goals and objectives. Petitioner's own private BCBA stated Student requires an "all hands on deck" approach to meet Student's needs. Petitioner's praise of the BCBA's ability to get Student to attend strengthens the District's proposed parameters of having two special education teachers along with a BCBA to provide homebound services.

Parents in this case conflate "educational placement" with "site selection." Parents must be involved in determining educational placement, but do not have to be involved in the site selection. *E. R. by E. R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 770 (5th Cir. 2018). Here, the ARD Committee, including Parents, agreed to Student's educational placement of homebound. The District must now determine the site location to implement Student's IEP. The District's most recent proposal to resume services in the home with three professionals, in an open area, with no parent interruption are reasonable because Student's *** is too small and over stimulating for Student, and Parent's presence during all instruction distracted Student.

The evidence showed the District's proposed IEP was reasonably calculated to provide an educational benefit to address Student's identified needs.

## 2. Least Restrictive Environment

The IDEA requires that a student with a disability shall be educated with non-

disabled peers to the maximum extent appropriate and that special classes, separate schooling and other removal from the regular education environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. This provision is known as the "least restrictive environment requirement." 34 C.F.R. § 300.114. State regulations require a school district's continuum of instructional arrangements be based on students' individual needs and IEPs and include a continuum of educational settings, including mainstream, homebound, hospital class, resource room/services, self-contained – regular campus (mild, moderate, or severe), nonpublic day school, or residential treatment facility. 19 Tex. Admin. Code § 89.1005(c).

To determine whether a school district is educating a student with a disability in the least restrictive environment, consideration must be given to:

- Whether the student with a disability can be satisfactorily educated in general education settings with the use of supplemental aids and services; and

- If not, whether the school district mainstreamed the student to the maximum extent appropriate.

*Daniel R.R. v. State Bd. of Educ.,* 874 F. 2d 1036, 1048 (5th Cir. 1989).

It is undisputed in this case that Student required educational services in the homebound setting due to Student's *** and autism. The dispute Parents have with the District's proposed placement is the location of services in the home as

addressed above, not the actual placement. Petitioner did not complain Student was not educated in Student's least restrictive environment; therefore, this factor favors the District.

### 3. Services Provided in a Coordinated, Collaborative Manner by Key Stakeholders

The IDEA contemplates a collaborative process between the school district and the parents. *E.R. v. Spring Branch Indep. Sch. Dist.*, Civil Action No. 4:16-CV-0058, 2017 WL 3017282, at *27 (S.D. Tex. June 15, 2017), *aff'd*, 909 F.3d 754 (5th Cir. 2018). The IDEA does not require a school district, in collaborating with a student's parents, to accede to a parent's demands. *Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 658 (8th Cir. 1999). The right to meaningful input does not mean a student's parents have the right to dictate an outcome, because parents do not possess "veto power" over a school district's decisions. *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003). Absent bad faith exclusion of a student's parents or refusal to listen to them, a school district must be deemed to have met the IDEA's requirements regarding collaborating with a student's parents. *Id.*

The evidence showed services were provided in coordinated, collaborative manner by key stakeholders. The Parents attended all ARD Committee meetings, often accompanied by an attorney. During the 2022–2023 school year, the ARD Committee met three times and many emails were exchanged between Parents and District personnel. Parents made meaningful input during the meetings, which resulted in changes to the PLAAFPs and were not excluded from participation.

Their disagreement over the District's proposal for the site selection for services does not negate the collaborative nature of the process. The District staff met weekly to collaborate and discuss Student's services, Student's abilities, needs, and the concerns about the room. Parent denied the District access to Student's private evaluators and private providers despite multiple District requests. Parents also denied the District access to Student's physician and did not provide Student's summer 2022 private evaluations until three months into the 2022–2023 school year. Student's private BCBA's evaluation actually recommended collaboration between physicians, school professionals, and other specialized providers.

Petitioner failed to establish that the District excluded Parents in bad faith or refused to listen to them, and therefore failed to meet Petitioner's burden on this factor.

## 4.    Academic and Non-Academic Benefits

Whether a student received academic and non-academic benefit is one of the most critical factors in any analysis as to whether a Student has received a FAPE. *R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 813-14 (5th Cir. 2012).

The evidence showed the IEP developed by the ARD Committee was reasonably calculated to provide Student academic and non-academic benefit. Homebound instruction was only provided for \*\*\* days. During that time,

Student began to form a bond with the homebound teacher and was ***. Student's SLP indicated *** decreased. *** days is a short timeframe to determine academic and non-academic benefit; however, Student was making progress, and the IEP was reasonably calculated to provide benefit. Parents and Student's current private BCBA claim Student regressed after District staff paused services; however, per the BCBA's July 2023 evaluation, Student continues to exhibit the same behaviors District providers witnessed. Student is ***, requires prompting to access Student's ***, and needs assistance for most activities. Student made progress during the time Student received instruction from District providers. Any regression, of which no credible evidence was provided, was due to the Parents refusing to allow the District to provide services to Student for the remainder of the school year.

Petitioner did not meet Petitioner's burden of demonstrating the IEP was not calculated to allow Student to make academic and non-academic progress.

5. **Conclusion as to the Four Factors**

The weight of the credible evidence showed that Student's educational program was individualized based on assessment and performance, offered an educational placement in the least restrictive environment, that the District made appropriate efforts to ensure Student's program was coordinated in a collaborative manner by key stakeholders, and that the IEPs were designed to result in academic and non-academic benefits. A preponderance of the evidence demonstrated that Student's IEPs were reasonably calculated to address

Student's needs in light of Student's

unique circumstances. *Rowley*, 458 U.S. at 188-89, 203-04; *Endrew F.*, 580 U.S. at

399.

**D.    Implementation of the IEP**

To prevail on an implementation claim under the IDEA, the party

challenging implementation of the IEP must show more than a de minimis failure to

implement all elements of that IEP, and instead, must demonstrate that the school

district failed to implement substantial or significant provisions of the IEP. This

approach affords school districts some flexibility in implementing IEPs while also

holding them accountable for material failures and for providing each student with

a disability a FAPE. *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th

Cir. 2000). Failure to implement a material portion of an IEP violates the IDEA,

but failure to execute an IEP perfectly does not amount to denial of FAPE. *See*

*Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 484 (4th Cir.

2011).


Additionally, when a parent brings a claim based on a school district's failure

to implement an IEP, the *Michael F.* first factor (whether the program is

individualized) and second factor (whether the program is administered in the least

restrictive environment) are generally "not at issue." *Spring Branch Indep. Sch.*

*Dist. v. O.W. by next friend Hanna W.*, 961 F. 3d 781, 795-96 (5th Cir. 2020) (citing

*Bobby R.*, 200 F.3d 341). Rather, a court or hearing officer must decide whether a

FAPE was denied by considering, under the third factor, whether there was a

"substantial or significant" failure to implement an IEP; and under the fourth

factor, whether "there have been demonstrable academic and non-academic

benefits from the IEP." *Id*. at 796 (citing *Bobby R*., 200 F.3d at 349).

In this case, the evidence showed the District implemented Student's IEP appropriately. The District providers used several of Student's accommodations when providing instruction. The District did not fail to implement substantial or significant portions of Student's IEP. As for the fourth factor regarding progress, the discussion above explained Student's progress. No credible evidence was presented that Student regressed. Furthermore, IEPs are intended to be implemented and measured for a given academic year; therefore, academic and non-academic benefits must be weighed considering the entirety of the academic year. *Lamar Consol. Indep. Sch. Dist. v. J.T. b/n/f Apr. S*., F. Supp. 3d 599, 607 (S.D. Tex. 2021). In this case, the *** days Student attended is well short of the academic year, limiting the weight of the concerns raised by Petitioner. Parents in this case cannot refuse to allow the District to provide services, then complain Student failed to make progress.

Petitioner did not present evidence that the District failed to implement any portion of the IEP when the District provided services to Student; therefore, Petitioner does not meet Petitioner's burden on this claim.

## E.    Training of District Staff

The IDEA requires that special education and related services be provided by "qualified personnel" who are appropriately and adequately prepared and trained, and who possess the content knowledge and skills to serve children with disabilities. 34 C.F.R. § 300.156(a).

The evidence showed Student's homebound teacher and SLP received

several specific trainings related to Student, including Student's *** as well as general trainings related to special education and the provision of a FAPE. Additionally, the District providers consulted with the District BCBA to understand strategies to use for Student. The providers were collecting data regarding Student's abilities and needs and, had services not stopped, may have received additional training. Petitioner did not meet Petitioner's burden to prove District staff were improperly trained.

### F.    Counterclaim – Override Lack of Parental Consent

Under the IDEA, school districts are required to obtain informed parental consent prior to conducting any reevaluation of a child with a disability. 34 C.F.R. §300.300(c)(i). If the parent of a student with a disability refuses to consent to a reevaluation, the school district may pursue the reevaluation by filing a due process hearing request to override lack of parental consent. 34 C.F.R. § 300.300(c)(1)(ii). To obtain such relief, a school district must show it is essential to override lack of parental consent and demonstrate reasonable grounds exist to do so. *Shelby v. Conrad*, 454 F.3d 450 (5th Cir. 2006). A school district that demonstrates the evaluation is essential for formulating a student's special education plan meets its burden for overriding the lack of parental consent. *Id.*

In this case, the District filed a counterclaim seeking to override lack of parental consent for reevaluations. After many discussions and emails about reevaluation, the District modified its request for reevaluation, and Parent still refused consent. Parents provided different reasons for the refusal, yet they had Student privately evaluated in the summers of 2022 and 2023. The main

disagreement for evaluations relates to the medical evaluation. Parents want to rely on the homebound needs evaluation provided to the District, and the District wants more information from the physician. Homebound is one the most restrictive placements for educational services. The District must have an accurate, current picture of Student's need for homebound services and whether any accommodations can be put in place to allow Student to attend a regular campus with Student's non-disabled peers. Parents' refusal to even allow communication with the physician makes it essentially impossible for the District to determine the full extent of Student's current medical needs.

A parent may not assert a student is entitled to special education services while simultaneously refusing to allow a school district to evaluate the student to determine what those services may be. *Andress S. v. Cleveland Indep. Sch. Dist.*, 64 F. 3d 176, 178 (5th Cir. 1995), *cert. denied*, 519 U.S. 812 (1996). A parent who desires for Parent's child to receive special education services must allow a school district to reevaluate Parent's child using school district personnel. *Id.* at 179. Parents want Student to continue to receive special education services in the home. As such, Parents must allow the District to reevaluate Student as requested.

## VI.   CONCLUSIONS OF LAW

1. The burden of proof in a due process hearing is on the party challenging the IEP. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

2. The District provided Student a FAPE during the relevant time period, and Student's IEP was reasonably calculated to address Student's needs in light of Student's unique circumstances. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458
   U.S. 176, 188, 203-04 (1982); *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch.*

31

*Dist. RE-1*, 580 U.S. 386, 399 (2017).

3.    The District properly implemented Student's IEP. *Spring Branch Indep. Sch. Dist. v. O.W.,* 961 F.3d 781, 797 (5th Cir. 2020).

4.    A reevaluation of Student is essential for formulating Student's special education plan, and reasonable grounds exists to override lack of parental consent. *Shelby v. Conrad*, 454 F.3d 450 (5th Cir. 2006); 34 C.F.R. § 300.300(c)(1)(ii).

## VII.   ORDERS

1.    Based upon the foregoing findings of fact and conclusions of law, Petitioner's requests for relief are **DENIED.**

2.    Based upon the foregoing findings of fact and conclusions of law, Respondent's request for an Order permitting a reevaluation of Student for medical and educational evaluations without parental consent is **GRANTED.**

All other relief not specifically stated herein is **DENIED.**

**Signed October 26, 2023.**

ALJ Signature:

_____

Kasey White

Presiding Administrative Law Judge

## VIII.  NOTICE TO THE PARTIES

The Decision of the Hearing Officer in this cause is a final and appealable order. Any party aggrieved by the findings and decisions made by the hearing officer may bring a civil action with respect to the issues presented at the due process hearing in any state court of competent jurisdiction or in a district court of the United States. 20 U.S.C. § 1415(i)(2); 34 C.F.R. §§ 300.514(a), 300.516; 19 Tex. Admin. Code § 89.1185(n).